OPINION REGARDING EXTRADITABILITY
 

 KAROL, United States Magistrate Judge.
 

 The Government of the United Kingdom, on instructions from the Crown Colony of Hong Kong, is seeking the extradition of Lui Kin-hong, a/k/a Jerry Lui (“Lui”), for alleged violations of section 9(l)(a) of the Prevention of Bribery Ordinance, Chapter 201, Laws of Hong Kong. The request for extradition was made pursuant to the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8,1972, 28 U.S.T. 227 (“the Treaty”), and the Supplementary Treaty Between the United States of America and the United Kingdom of Great Britain and Northern Ireland, June 25, 1985, T.I.AS. No. 12050 (“the Supplementary Treaty”).
 
 [1]
 
 Lui has raised several objections to extraditability, including objections based on the fact that sovereignty over Hong Kong will revert to the People’s Republic of China (“PRC”) on July 1, 1997, pursuant to the Joint Declaration of the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the People’s Republic of China on the Question of Hong Kong, Dec. 19, 1984 (“the Joint Declaration”). (United States’ exs. vol. 1, ex. CHL-1 to Aff. of Lena Chi Hui-Ling).
 

 This court held an extradition hearing on three consecutive days commencing May 28, 1996, and the parties filed lengthy pre- and post-hearing memoranda and reply memoranda. Upon careful consideration of the evidence, the memoranda, and the arguments of counsel. I conclude for the reasons stated below that Lui is extraditable on all charges except Charge 2, which charge relates to an alleged payment made to him in October 1988.
 

 I. Background
 

 It is undisputed that Lui, a citizen of Hong Kong and, since 1994, of Canada, was employed by Brown & Williamson Tobacco Corporation (“B & W’), a United States corporation, from August 1988 to May 1, 1993. B & W, a wholly owned subsidiary of British-American Tobacco Industries PLC (“BAT PLC”), manufactures and distributes worldwide a number of popular brands of cigarettes, including Kent, Lucky Strike, and Viceroy. Beginning in June 1990, while Lui was still an employee of B & W, he was “seconded” to British-American Tobacco Company (Hong Kong) Limited (“BAT-HK”), a Hong Kong corporation that distributes cigarettes manufactured by B & W and others to countries in the Far East. BAT-HK is a wholly owned subsidiary of British-American Tobacco Company Limited, an English corporation that is wholly owned by BAT PLC. It was not clear from the evidence what responsibilities Lui actually performed at B & W from August 1988 until he was seconded to BAT-HK in June 1990, although he apparently held the title Regional Director for Taiwan and the Philippines and worked out of a Taiwan office during at least the latter part of that period. It was also unclear what his responsibilities, if any, were with respect to BAT-HK when he was initially seconded there. With respect to the latter point, the evidence revealed only that he was first posted to BAT-HK to serve as the “eyes and ears” of B & W and “to act as a liaison officer.” (United States’ exs. vol. 2 ex. KPZ-8 to Affirmation of Kevin Paul Zervos, David George Emmerson test, at 183.)
 

 It is also undisputed that, effective January 1,1992, while he was still employed by B & W but stationed at BAT-HK and living in Hong Kong, Lui became BAT-HK’s Director of Exports. He remained in that key posi
 
 *939
 
 tion until he resigned from B & W effective May 1, 1993. As Director of Exports, Lui was influential in determining how many cartons of cigarettes (including, but apparently not limited to, brands manufactured by B & W) BAT-HK would allocate to each of its distributors for resale. One of BAT-HK’s distributors was Giant Island Ltd. (“GIL”). In a ten-charge warrant, the details of which are discussed below, Hong Kong authorities allege that, from 1988 to 1993, Lui accepted bribes from GIL or its affiliate, Wing Wah Company (‘Wing Wah”), in violation of section 9. The bribes were allegedly paid to induce Lui to cause BAT-HK to make favorable allocations of cigarettes to GIL or Wing Wah or to reward him for having done so. It is undisputed that Lui had no authority to influence BAT-HK’s allocation decisions until several years after the first payment was allegedly made in October 1988. Indeed, it is undisputed that Lui was not even seconded to BAT-HK until more than a year and a half after the initial payment. Hong Kong authorities nevertheless allege that the payments commenced as early as they did because Lui, GIL, and Wing Wah had the foresight to anticipate as early as October 1988 that Lui would eventually become influential in making cigarette allocation decisions on behalf of BAT-HK.
 

 Effective May 1,1993, Lui left B & W and BAT-HK and immediately began working for a company affiliated with GIL. In April 1994, Hong Kong authorities sought to arrest Lui, but he had already left Hong Kong for the Philippines, where his employer had set up operations and with whom Hong Kong had no extradition treaty. As far as the record reveals, Lui never returned to Hong Kong, despite the fact that, for at least most months in the past two years, his wife and children remained there. Hong Kong authorities learned that Lui would be flying to Boston on personal business on December 20, 1995, and they arranged to have him arrested at Logan Airport upon his arrival. He has been held in custody since that date.
 
 See In re Extradition of Lui Kin-Hong,
 
 913 F.Supp. 50 (D.Mass.),
 
 habeas corpus granted by Kin-Hong v. United States,
 
 926 F.Supp. 1180 (D.Mass.),
 
 order rev’d,
 
 83 F.3d 523 (1st Cir.1996) (per curiam).
 

 II. The Charges
 

 Although several warrants for Lui’s arrest have been issued in Hong Kong since 1994, the most recent one, and the one that is operative here, is dated February 5, 1996.
 
 [2]
 
 (United States’ exs. vol. 1, ex. RGM-5 to Affirmation of Roger Gordon MeMeans.) The warrant sets forth ten charges, all brought under section 9(l)(a) and one also brought under common law. The first charge is that Lui, as an agent of “Brown and Williamson Limited”
 
 [3]
 
 and of BAT-HK, conspired in Hong Kong, between June 1, 1988, and December 31, 1993, with present and former principals of GIL and Wing Wah to “accept advantages ... as an inducement to or reward for or otherwise on account of ... [Lui’s] doing or having done an act in relation to his principal’s affairs or business, namely, ensuring the sale and supply of cigarettes from [BAT-HK] to Wing Wah Company and/or [GIL] and/or [associated] companies____”
 

 Charges 2 through 10 charge Lui with substantive violations of section 9. Specifically, charges 2 through 8 charge Lui with accepting advantages in the following amounts on the dates indicated:
 

 HK$1,953,260 on or about October 21,1988 2rd Charge:
 

 HK$2,000,000 on or about February 17,1990 3rd Charge:
 

 HK$2,000,000 on or about April 3,1990 4th Charge:
 

 
 *940
 
 5th Charge HK$3,000,000 on or about May 17,1991
 

 6th Charge HK$5,000,000 on or about August 22,1991
 

 7th Charge HK$3,255,070 on or about April 8,1992
 

 8th Charge HK$6,055,070 on or about January 20,1993
 

 Charges 9 and 10 charge Lui with accepting advantages in the form of unsecured loans in the amounts of HK$3,000,000 and HK$7,000,000, respectively, from a GIL affiliate between January 1, 1993, and April 30, 1993. Since the exchange rate between Hong Kong and United States dollars is in the range of 7 to 1,
 
 see, e.g., Currency Trading,
 
 Wall St.J., Aug. 20, 1996, at C20, Lui is alleged to have accepted outright payments of approximately US$3,000,000 and unsecured loans in the order of magnitude of US$1,500,000.
 

 As noted, each charge is brought under section 9, entitled “Corrupt transactions with agents,” which provides, in pertinent part:
 

 (1) Any agent who, without lawful authority or reasonable excuse, solicits or accepts any advantage as an inducement to or reward for or otherwise on account of his—
 

 (a) doing or forbearing to do, or having done or forborne to do, any act in relation to his principal’s affairs or business; or
 

 (b) showing or forbearing to show, or having shown or forborne to show, favour or disfavour to any person in relation to his principal’s affairs or business.
 

 shall be guilty of an offence.
 

 Other relevant provisions of the Prevention of Bribery Ordinance include: section 2(1), which defines the term “advantage” as meaning, among other things, “(a) any gift, loan, fee, reward or commission consisting of money,” the term “agent” as “inelud[ing] ... any person employed by or acting for another,” and the term “principal” as “includ[ing] ... an employer”; section 2(2)(c), which states that “a person accepts an advantage if he ... directly or indirectly takes, receives or obtains, or agrees to take, receive or obtain any advantage”; section 12(l)(a)(in), which provides for a term of imprisonment of up to seven years for a violation of section 9; and section 12A, which specifies the same penalty upon conviction of conspiracy to violate section 9.
 

 III. Overview of United States Extradition Law
 

 In the United States, extradition is governed entirely by treaty and statute.
 
 See, e.g., In re Extradition of Howard (United States v. Howard),
 
 996 F.2d 1320, 1329 (1st Cir.1993). In this case, it is undisputed that the applicable treaty is the 1972 Treaty, as supplemented by the 1985 Supplementary Treaty, and that the applicable statutes are 18 U.S.C. §§ 3184 and 3186 (1994).
 
 [4]
 

 Although some of the inquiries in a particular extradition proceeding vary with the specific terms of the applicable treaty and the nature of the case, certain principles govern all extradition cases in which the
 
 *941
 
 United States is the requested party. Foremost among these principles is that the responsibilities in extradition matters are divided between a judicial officer, such as a magistrate judge, and the Secretary of State.
 
 See id.
 

 Section 3184 defines the role of the judicial officer in the extradition process. The judicial officer is to determine whether the accused, sometimes referred to as the relator, is extraditable in accordance with the terms of the governing treaty and statutes.
 
 See id.
 
 § 3184. Primarily this means that the judicial officer must determine whether the United States and the requesting country are parties to a valid extradition treaty; whether the relator is in fact the person who has been charged by the requesting state; whether an arrest warrant from the requesting state is outstanding; whether the offenses with which the relator is charged are extraditable under the treaty; and whether there is probable cause to believe that the relator committed the crime charged.
 
 See Howard,
 
 996 F.2d at 1324 n. 1. The judicial officer hears “the evidence of criminality’’ and decides whether it is “sufficient to sustain the charge under the provisions of the proper treaty or convention.”
 
 See
 
 18 U.S.C. § 3184. If it is, the judicial officer “shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue.”
 
 Id.
 
 The Secretary of State must then exercise discretion to determine whether the accused should actually be extradited.
 
 [5]
 

 See id.
 
 § 3186;
 
 see also In re United States (Allen v. Schultz),
 
 713 F.2d 105, 108, 109 (5th Cir. 1983);
 
 Escobedo v. United States,
 
 623 F.2d 1098, 1105-06 (5th Cir.),
 
 cert. denied,
 
 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980) and
 
 sub nom. Castillo v. Forsht,
 
 450 U.S. 922, 101 S.Ct. 1371, 67 L.Ed.2d 350 (1981);
 
 Spatola v. United States,
 
 741 F.Supp. 362, 370 (E.D.N.Y.1990),
 
 affd,
 
 925 F.2d 615 (2d Cir.1991).
 

 This division of responsibility in matters of extradition is longstanding and eminently sensible. It reflects the fact that some aspects of the extradition decision— such as whether there is probable cause to believe that the accused committed an extraditable offense — are legal and do not tend to implicate foreign policy concerns, while others — such as whether a request for extradition should be denied because of the requesting state’s disrespect for human rights — are likely to have significant foreign policy implications that should be evaluated by the branch of government that has primary responsibility for the conduct of foreign affairs.
 

 Consistent with this division of responsibility, courts have developed the “rule of non-inquiry.” The rule holds that courts must not, in discharging their statutory responsibility to determine extraditability, consider such things as the requesting country’s motive in seeking extradition, the requesting country’s 'willingness and ability to protect the accused, or even the type of treatment to which the requesting country might subject the accused if extradition is permitted.
 
 See, e.g., Sindona v. Grant,
 
 619 F.2d. 167, 174 (2d Cir.1980) (“[T]he degree of risk to [relator’s] life from extradition is an issue that properly falls within the exclusive purview of the executive branch.”);
 
 Peroff v. Hylton,
 
 542 F.2d 1247, 1249 (4th Cir.1976) (“A denial of extradition by the Executive may be appropriate when strong humanitarian grounds are present.”), ce
 
 rt. denied,
 
 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977). This rule was adopted by the First Circuit in
 
 In re Extradition of Manzi (United States v. Manzi),
 
 888 F.2d 204, 206 (1st Cir.1989) (per curiam)
 
 *942
 
 (“Courts have chosen to defer [questions regarding the procedures or treatment that might await an individual on extradition] to the executive branch because of its exclusive power to conduct foreign affairs.”),
 
 cert. denied,
 
 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990). In a subsequent case the First Circuit stated:
 

 Concerns of the sort raised here are for the executive branch because of its exclusive power to conduct foreign affairs, as extradition proceedings necessarily implicate the foreign policy interests of the United States.
 

 For these reasons the Secretary of State has
 
 sole discretion
 
 to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime. Similarly, the degree of risk to [the relator’s] life from extradition is an issue that properly falls within the
 
 exclusive purview
 
 of the executive branch.
 

 See Koskotas v. Roche,
 
 931 F.2d 169, 174 (1st Cir.1991) (internal quotation marks and citations omitted). It must be emphasized that the reason for the rule is not that courts regard concerns about motives, protection, and probable treatment of the accused to be irrelevant to the extradition decision or unworthy of consideration. Rather, it is that courts recognize that the ultimate decision to extradite is essentially a political one better made by the branch of government that has primary responsibility for the conduct of foreign affairs. In the final analysis, the question is not
 
 what
 
 factors should be considered, but
 
 who
 
 should consider them.
 

 IV. The Treaty and the Supplementary Treaty
 

 Because so many of the issues that Lui has raised turn on the language of the applicable treaties, an overview of their key provisions will be helpful to later analysis.
 

 A. The Treaty
 

 Article II(l)(a) of the Treaty provides, in substance, that the Treaty shall apply to “any territory for the international relations of which the United Kingdom is responsible,” provided that the parties, through an exchange of notes, so agree.
 
 See
 
 28 U.S.T. at 229. It was pursuant to this provision that diplomatic notes were exchanged in 1976 that made the Treaty applicable to Hong Kong.
 
 See id.
 
 at 238-41. Significantly, Article 11(2) provides that the applicability of the Treaty to any particular territory “may be terminated by either Contracting Party giving six months’ written notice to the other through the diplomatic channel.”
 
 See id.
 
 at 229. Thus, the United States, because of concern about the upcoming reversion of Hong Kong to the sovereignty of the People’s Republic of China (“PRC”), or for any other reason, acting through the Secretary of State, could have terminated the applicability of the Treaty to Hong Kong by giving six months’ notice, without terminating the Treaty in any other respect.
 
 [6]
 
 Indeed, the United States could still do so at any time.
 

 To the extent that the Treaty is deemed to include a requirement of so-called “dual criminality,” such requirement is found in Article III. Article III provides that “[ejxtradition shall be granted for an act or omission the facts of which disclose an offense within any of the descriptions listed in the Schedule annexed to this Treaty, • • • or any other offense, if,” among other things, the offense is a felony under the laws of both parties.
 
 See id.
 
 at 229-30. The schedule of extraditable offenses annexed to the Treaty includes, as category number 23, “Bribery, including soliciting, offering or accepting bribes.”
 
 See id.
 
 at 235. I will address below the question whether the fact that bribery is a scheduled offense
 
 per se
 
 satisfies the requirement under the Treaty (and, by incorporation, under 18 U.S.C. § 3184) that the offense for which extradition is sought be an extraditable one, without further regard to whether bribery constitutes a felony under both United States and Hong Kong law.
 

 Article IV provides as follows:
 

 If the offense for which extradition is requested is punishable by death under the relevant law of the requesting Party, but
 
 *943
 
 the relevant law of the requested Party does not provide for the death penalty in a similar ease, extradition may be refused unless the requesting Party gives assurances satisfactory to the requested Party that the death penalty will not be carried out.
 

 Id.
 
 at 230. As will be seen, Lui, who is legitimately concerned about the reversion of Hong Kong to PRC sovereignty, relies upon this provision in opposing the request for extradition, notwithstanding that bribery is not punishable by death under current Hong Kong law.
 
 See
 
 Prevention of Bribery Ord., eh. 201, § 12, Laws of Hong Kong. It should be noted that the Treaty does not address the question whether discretion to refuse extradition in cases to which Article IV applies is vested in the judicial officer, who determines extraditability, or in the Secretary of State, who makes the actual decision whether to extradite.
 
 [7]
 

 Article VII includes a requirement that the request for extradition of an accused person be accompanied by a warrant of arrest and “by such evidence as, according to the law of the requested Party, would justify his committal for trial if the offense had been committed in the territory of the requested Party.”
 
 See
 
 28 U.S.T. at 231. Article VII further provides that the warrant of arrest and any evidence, if given on oath or affirmed,
 
 “shall
 
 be received in evidence in any proceedings for extradition” if it is duly authenticated in any of several specified ways.
 
 See id.
 
 at 231-32 (emphasis added). Although, as discussed below, Lui vigorously contests the admissibility of some of the evidence proffered by the requesting party in this ease, he does not contest its authenticity or deny that it was authenticated in accordance with the technical requirements expressly set forth in the Treaty.
 

 Consistent with Article VII, Article IX provides that “[ejxtradition shall be granted only if the evidence be found sufficient according to the law of the requested Party ... to justify the committal for trial of the person sought if the offense of which he is accused had been committed in the territory of the requested Party.”
 
 See id.
 
 at 232. I will address below two questions raised by this provision: (1) whether the “law of the requested Party” refers only to substantive law or also to rules of evidence and (2) whether under this provision it is necessary for the judicial officer to make an independent determination whether the evidence is sufficient to demonstrate probable cause that the accused violated the substantive law of the requesting party.
 

 Article XII, the Treaty’s so-called “specialty” provision, is central to Lui’s reversion argument., It provides, in substance and with some exceptions not applicable here, that a person who has been extradited to the requesting country shall neither be proceeded against in that country for any offense other than one for which extradition had been granted nor reextradited to a third country.
 
 See id.
 
 at 233.
 

 The next provision of interest is Article XVI. As noted, Article XVI(4) permits either party to terminate the entire Treaty by giving six months’ notice “through the diplomatic channel.”
 
 See id.
 
 at 234. Article XVI(2) is also potentially significant. It provides that the Treaty
 

 shall apply to any offense listed in the annexed Schedule committed
 
 before or after
 
 this Treaty enters into force, provided that extradition shall not be granted for an offense committed
 
 before
 
 this Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.
 

 Id.
 
 (emphasis added). In other words, if a scheduled offense was allegedly committed
 
 before
 
 the Treaty became effective and such offense was not an offense in both countries
 
 *944
 
 at the time, the Treaty does not apply. But if, as was the case here, a scheduled offense was allegedly committed
 
 after
 
 the Treaty became effective, the Treaty does apply, without any exception for an offense that was not then an offense in both countries. By making this distinction, Article XVI(2) strongly supports the view that any scheduled offense that was committed after the Treaty became effective is extraditable
 
 per se
 
 under Article III, without the need for specific inquiry regarding whether it was a felony or, for that matter, an offense at all in both countries.
 

 B. The Supplementary Treaty
 

 Consistent with the Treaty, Article 2 of the Supplementary Treaty provides, in part, that “[t]he evidence of criminality must be such as, according to the law of the requested Party, would justify committal for trial if the offense had been committed in the territory of the requested Party.”
 
 See
 
 T.I.AS. No. 12050, at 7. The Supplementary Treaty does not specifically address the question whether the “law of the requested Party” refers only to the requested party’s substantive criminal law or also to its law of evidence.
 

 Article 2 also gives the accused in the United States the explicit right to present evidence,
 
 inter alia,
 
 of “probable cause,” which is expressly defined to mean that “there is sufficient evidence to warrant a man of reasonable caution in the belief that” the person before the court is the person sought and that such person has committed “an offense.”
 
 See id.
 

 Article 3 expressly provides that “extradition shall not occur if the person sought establishes to the satisfaction of the competent judicial authority by a preponderance of the evidence” that the extradition request was made for an ulterior political or otherwise discriminatory purpose or that, if extradited, the accused would be discriminated against at trial on political or otherwise discriminatory grounds.
 
 See id.
 
 Significantly, despite the fact that the Supplementary Treaty by its express terms applies to Hong Kong and was signed and entered into force
 
 after
 
 the United Kingdom had agreed in the 1984 Joint Declaration to return sovereignty over Hong Kong to the PRC effective July 1, 1997, Article 3 does not prohibit extradition where it appears that the accused, if extradited and convicted in the pre-reversion period, might or would likely still be serving a sentence in the post-reversion period. In fact, Article 3 does not even address reversion. The fact that the Supplementary Treaty is silent regarding reversion calls into question Lui’s argument, discussed below, that his extradition would violate the express terms of the Treaty or Supplementary Treaty-
 

 F.
 
 Discussion and Analysis
 

 Lui does not dispute that charges are pending against him in Hong Kong, that he is the person sought in the warrant that has been presented to the court, that an extradition treaty exists between the United States and the United Kingdom that applies to Hong Kong, or that the government of the United Kingdom, on behalf of Hong Kong, has made a request for extradition that meets the formal requirements of the Treaty, the Supplementary Treaty, and 18 U.S.C. § 3184. He vigorously disputes, however, that he is charged with an extraditable offense, that there is probable cause that he committed such offense, and that he may be extradited to Hong Kong less than one year before Hong Kong is to revert to PRC sovereignty. ■
 

 A
 
 Extraditable Offense
 

 As noted, Lui is charged with one count of conspiring to accept bribes (called “advantages” under Hong Kong law) and nine substantive counts of accepting bribes. The schedule of extraditable offenses annexed to the Treaty includes, as category number 23, “Bribery, including soliciting, offering or accepting bribes.”
 
 See
 
 28 U.S.T. at 235. Under one quite plausible reading of Article III of the Treaty, because the offenses that Lui allegedly committed clearly fall within a scheduled category, a judicial officer need go no further to conclude that the offenses with which Lui is charged are extraditable. After all, Article III clearly states that “[ejxtradition shall be granted for an act or omission the facts of which disclose an offense within
 
 *945
 
 any of the descriptions listed in the Schedule annexed to this Treaty,
 
 which is an integral part of the Treaty
 
 [.]”
 
 See id.
 
 at 229 (emphasis added).
 

 Admittedly, the sentence quoted immediately above continues as follows: “or any other offense, if
 
 [inter alia,
 
 the offense is a felony in both countries].”
 
 See id.
 
 at 229-30. One could conceivably read the clause beginning with “if” as qualifying not just the phrase “any other offense,” but scheduled offenses as well. But if the qualifying requirement that the offense be punishable as a felony in both countries is read to apply to both scheduled and unscheduled offenses, then the schedule would appear to serve no purpose. Thus, according to this interpretation, a charged offense would be extraditable if it was a felony in both countries, even if it was not scheduled, and, conversely, it would not be extraditable if it was not a felony in both countries, even if scheduled. Consistent with ordinary principles of statutory construction, a reading that renders “an integral part of the Treaty” utterly meaningless should be avoided if another plausible interpretation is available.
 
 See, e.g., United States Nat’l Bank of Oregon v. Independent Ins. Agents of America, Inc.,
 
 508 U.S. 439, 454-55, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993);
 
 United States v. Flores,
 
 968 F.2d 1366, 1370-71 (1st Cir.1992). Here, of course, there is another interpretation that not only is plausible, but also is consistent with the plain language of the Treaty: if the offense clearly falls within a scheduled category, it is extraditable
 
 per se.
 

 Only one case was found that concluded, on the basis of the foregoing language, that any offense that falls within any of the enumerated categories in the schedule is extraditable
 
 per se.
 
 In
 
 Oen Yin-Choy v. Robinson,
 
 858 F.2d 1400 (9th Cir.1988),
 
 cert. denied,
 
 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989), a case that also involved extradition to Hong Kong, the Ninth Circuit held that the crimes there under consideration were extraditable because they were of the type listed in the schedule:
 

 The offenses with which Oen is charged, false accounting and publishing a false statement, are listed in the schedule of offenses referred to in Article III of the Treaty. Thus, the Treaty specifically refers to the offenses with which Oen is charged, and the requirement of dual criminality is met.
 

 See id.
 
 at 1405. The
 
 Oen
 
 court then further held that the requirement of dual criminality was
 
 also
 
 met “because the Hong Kong crimes of false accounting and publishing a false statement are substantially analogous to the federal crime of making a false entry in a bank statement.”
 
 See id
 

 [8]
 

 On the other hand, in
 
 Branch v. Raiche,
 
 618 F.2d 843 (1st Cir.1980), the First Circuit appeared to assume, without acknowledging the issue raised here, that, even if an offense was of a type included in the schedule, dual criminality would not be satisfied unless a “substantially analogous” counterpart of the foreign offense could be found and was punishable as a felony under law in the United States.
 
 See id.
 
 at 850-54. Thus, even though all three categories of offenses there under consideration appear to have fit within at least one of two scheduled categories— “[o]btaining property ... by false pretenses” (category number 17) or “[a]n offense relating to counterfeiting or forgery” (category number 22),
 
 see
 
 Treaty, 28 U.S.T. at 235— the
 
 Branch
 
 court proceeded to determine whether the charged offenses existed and were felonies in the United States.
 
 See
 
 618 F.2d at 850-54. Indeed, although the court did not have to reach the issue, it took the dual criminality analysis even further in concluding that the conduct alleged in the third category of charges did not even state an offense under England’s Theft Act of 1968, notwithstanding that an indictment had been returned in England charging the accused
 
 *946
 
 with ten violations of that statute.
 
 See id.
 
 at 847, 853-54.
 

 At first glance, the issue of whether an offense that fits within a scheduled category is extraditable
 
 per se
 
 may seem entirely academic. Under any reading of the Treaty, the judicial officer must still determine whether the evidence of criminality would suffice to hold the accused for trial if the alleged offense had been committed in the United States. The first step in any such probable cause determination is necessarily the identification of a law in the United States that would have been violated if the accused had engaged in the charged conduct in this country. Thus, it might initially appear that the separate probable cause inquiry will always subsume the dual criminality analysis.
 

 This will not necessarily always be the case, however. In the first place, a scheduled offense might conceivably be a misdemeanor under the only United States law on point. If that were the case, and if the offense nevertheless fell into a scheduled category, the accused would be extraditable if (a) there were probable cause that he or she had engaged in conduct that constituted the offense and (b) scheduled offenses were extraditable
 
 per se.
 
 On the other hand, the accused would not be extraditable on the same facts if scheduled offenses were not extraditable
 
 per se,
 
 because the charged conduct would not have been a felony under United States law.
 

 Second, as will be discussed below, it is not clear that the probable cause analysis ever mandates that the judicial officer in the United States inquire or analyze whether the charged conduct, assuming that it occurred, would constitute a violation of foreign law. If it does not, and if the dual criminality requirement does not independently mandate that a specific foreign law be identified by the judicial officer in the United States as having been violated where the offense charged is of the scheduled variety,
 
 [9]
 
 then it would be possible for a judicial officer to conclude that the accused is extraditable for a scheduled offense without engaging in a detailed analysis to determine whether the charged conduct constitutes an offense under the foreign law.
 

 As the foregoing discussion demonstrates, there is some uncertainty about whether clearly scheduled offenses such as “bribery” are extraditable
 
 per se,
 
 without further consideration of dual criminality. Therefore, notwithstanding that Lui has clearly been charged with a scheduled offense, I will proceed to consider the arguably unnecessary question whether Lui has been charged with conduct that would also constitute a felony under both United States and Hong Kong law.
 

 The essence of the charges against Lui is that he conspired to accept and that he actually accepted money and loans in exchange for the use of his influence to cause BAT-HK to allocate its limited supply of cigarettes to the distributors that paid the bribes. In some cases the payments were allegedly solicited and made before Lui was an agent of BAT-HK, with the expectation that one day he would occupy a position of influence; in some eases the payments were allegedly made when Lui was an agent of BAT-HK and had considerable influence over its allocation of cigarettes to distributors; and in some cases the payments, in the form of loans, were made when Lui was no longer an agent of BAT-HK and had no influence over its allocation of cigarettes. In each ease in which the payment was made outright, the money, according to the government’s evidence, was ultimately wired to one of Lui’s bank accounts outside Hong Kong. (United States’ Extradition Mem., docket no. 38, at
 
 *947
 
 14-18; United States’ Post-Hr’g Mem., docket no. 76, at 3 — 4.) The question presented is whether the solicitation and acceptance of payments under each of these three sets of circumstances would be a felony under both United States and Hong Kong law.
 

 The requirement that the charged conduct constitute a felony under United States law is satisfied if the charged conduct violates federal law, the law of the asylum state, or the law of the preponderance of the states.
 
 See Branch,
 
 618 F.2d at 851. The government argues that, at least since the enactment of 18 U.S.C. § 1346, effective November 18, 1988,
 
 [10]
 
 all the outright payments, at least, would violate the federal wire fraud statute, 18 U.S.C. § 1343 (1994), under all three sets of circumstances. (United States’ Post-Hr’g Mem. at 2-4.) I agree.
 

 Section 1346 defines “scheme or artifice to defraud,” as that term is used,
 
 inter alia,
 
 in section 1343, to include “a scheme or artifice to deprive another of the intangible right of honest services.” The wire fraud statute has been interpreted to have a rather broad application. The wire need not be essential to the scheme — it is sufficient if the use of the wire is incidental to the scheme.
 
 See United States v. Sawyer,
 
 85 F.3d 713, 723 n. 6 (1st Cir.1996) (citing
 
 United States v. Grandmaison,
 
 77 F.3d 555, 566 (1st Cir.1996)). It is not required that the wire be used to communicate a fraudulent message.
 
 See Schmuck v. United States,
 
 489 U.S. 705, 714-15, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989) (mail fraud):
 
 Sawyer,
 
 85 F.3d at 723 (stating that wire and mail fraud statutes contain the same relevant language and thus entail similar analysis). In addition, in contrast to the relevant Massachusetts statute and the Hong Kong ordinance, as discussed below, the applicability of the wire fraud statute does not turn on the existence of an agency or fiduciary relationship. Thus, in the analysis under the wire fraud statute, no consideration need be given to whether an employee who allegedly accepted a bribe in exchange for his or her honest services was on the payroll or had any influence when the bribe was actually paid. Therefore, I have no doubt that the conduct charged in Counts 1 and 3 through 8 would constitute a felony under federal law if it had occurred here.
 
 [11]
 

 Because the conduct charged in Counts 1 and 3 through 8 would constitute a felony under federal law, there is no need to consider whether the conduct charged in those counts would also constitute a felony under state law.
 
 [12]
 

 See Branch,
 
 618 F.2d at 848, 851. Nonetheless, in the interest of completeness and because the government has proffered no evidence regarding the use of the mail or wire in connection with the loans charged in Counts 9 and 10, I will now discuss why the charged conduct would probably violate Massachusetts law in all respects and clearly would with respect to Counts 9 and 10.
 

 The Massachusetts statute most directly on point is Mass.Gen.L. eh. 271, § 39(a) (1994), which provides, in pertinent part:
 

 
 *948
 
 Whoever, in relation to any transaction or matter concerning the business affairs of an employer, principal or beneficiary ... (2) as an agent or fiduciary, solicits, accepts or agrees to accept any benefit or anything of value from another person who is not an employee, principal, or beneficiary upon an agreement or understanding that such benefit or thing of value will influence his conduct, shall be punished by imprisonment in the state prison for not more than five years----
 

 Undoubtedly the crime set forth in section 39(a) is a felony, and the conduct of which Lui is accused in Counts 1 (conspiracy) and 7 and 8 (accepting bribes while he was BAT-HK’s Director of Exports to use his influence in that position to cause BAT-HK to provide the payor with a favorable allocation of cigarettes) constitutes a violation of section 39(a). Similarly, a crime would indisputably have been committed under section 39(a) if, as charged in Counts 9 and 10, an employee, while still employed by an employer, agreed to accept a future bribe, to be paid after the employee’s employment had terminated, in exchange for the employee’s exercise of favorable influence while still an employee. This leaves for consideration the crimes charged in Counts 3 through 6.
 

 Counts 3 through 6 are the remaining anticipatoiy bribe charges, which accuse Lui of accepting bribes before he became BAT-HK’s Director of Exports. The government’s theory is that these payments were made in anticipation that Lui would eventually ascend to a position within BAT-HK where he would be able to exercise influence in favor of GIL and its affiliates. (United States’ Extradition Mem. at 8, 11, 25-26: United States’ Post-Hr’g Mem. at 8, 30, 36.) The crucial question that this theory raises is whether section 39(a) would apply to the acceptance of a bribe by a possible candidate for a position as agent, where the bribe was for favors that the recipient agreed to provide if he or she was later in a position to do so. Although there appears to be no Massachusetts ease directly on point. I believe section 39(a) would apply in that situation, at least where the expectation proved to be well-founded and the recipient delivered the promised benefits when the opportunity to do so presented itself.
 

 My reasoning is perhaps best explained by a simple hypothetical. Assume that Prospective Employee (“PE”) of Company C (“C”) says something along the following lines to Prospective Supplier (“PS”): “Although I am not presently employed by C, I have applied for the job of director of purchasing for C and am one of two finalists for the position. If I obtain the position, I will be able to ensure that C purchases large quantities of raw materials from PS. In exchange for my directing this business to you, I want you to pay me $1 million. You must pay me the $1 million before I get the job, since it will be illegal for me to accept a bribe once I become a C employee. If I do not get the job, I will return the payment.” PS agrees and pays the $1 million to PE; PE subsequently obtains the job, steers lucrative purchase contracts to PS, and keeps the payment.
 

 I believe that PE has violated section 39(a) under any of at least three theories: (1) the payment was an advance until PE obtained the job and thus his ability to carry out his end of the bargain, at which point — and not before — acceptance within the meaning of section 39(a) initially occurred; (2) even if PE “accepted” the $1 million before PE was hired by C, it was not until after PE obtained the job that he could and did “accept” “as an agent” by retaining the payment while an agent; and (3) regardless of when acceptance occurred, there was a continuing agreement by PE to accept the payment in exchange for his influence, which agreement extended into the post-hiring period.
 

 I further believe that the same analysis would apply even if PE had made it clear to PS that PE would keep the $1 million whether he obtained the job or not. In that case, if it turned out that PE did get the job, his right to retain the payment would still be contingent upon the fulfillment of his promise to steer contracts to PS. In that sense, at least, PE’s acceptance would not finally occur and his agreement would be a continuing one until he had fulfilled his end of the bargain. Therefore, although the question is not entirely free from doubt, it is sufficiently likely that the conduct charged in the anticipatory
 
 *949
 
 bribe counts comes within the reach of section 39(a) to satisfy dual criminality.
 
 See Brauch,
 
 618 F.2d at 853 (“While neither party has cited New Hampshire case law that allows us to predict with certainty whether [the charged conduct] would constitute felonious forgery under [New Hampshire] R.S.A. 638:1, we are satisfied that the appellant’s conduct is sufficiently within the scope of that statute to meet the double criminality requirement.”).
 

 I shall now proceed to analyze the charges under Hong Kong law. Section 9 (together with section 12) makes it a felony for an “agent” to “aecept[ ] any advantage” in exchange for the agent’s influence “in relation to his principal’s affairs or business.” It appears that the analysis under section 9 is substantially analogous to the analysis under section 39(a). To the extent that Lui might have accepted bribes while he was BAT-HK’s Director of Exports, his conduct would clearly have been illegal. To the extent that he might have accepted bribes (in the form of loans) after he left BAT-HK pursuant to an earlier agreement made while he was still BAT-HK’s Director of Exports, his conduct would also have been illegal.
 
 [13]
 

 That leaves for consideration the more difficult question whether section 9 proscribes bribes that Lui allegedly accepted before he became an agent of BAT-HK but in anticipation that he would become one in the near future. Before I attempt to answer that question, it should be noted that, by the time that any extradition request reaches the court in the United States, a judicial officer in the requesting country has already made at least a preliminary determination that the charged conduct is illegal in the requesting country. This suggests the following threshold question: what standard of review should the judicial officer in the United States apply to the foreign judicial officer’s determination that foreign law proscribes the charged conduct? Unfortunately case law provides little, if any, guidance on this question.
 

 At one extreme, the determination by the foreign judicial officer might be viewed as dispositive. This interpretation would be untenable, however, since the Treaty, at least in cases involving nonscheduled offenses, imposes a duty on the requested party’s judicial officer to determine whether the facts disclose an offense that is punishable under the law of both parties as a felony.
 
 See
 
 Treaty, Art. III, 28 U.S.T. at 229-30. This requirement would be meaningless if the determination by the foreign judicial officer were dispositive. At the other extreme, review should probably not be
 
 de novo,
 
 since comity, if not common sense, suggests that the foreign judicial officer should be presumed to be more knowledgeable than the judicial officer in the United States about the foreign law. This suggests the following intermediate standard of review: where the foreign statute can reasonably be interpreted in more than one way, the judicial officer in the United States should defer to any reasonable interpretation by the foreign judicial officer, even if the former, considering the matter
 
 de novo,
 
 might have interpreted the statute differently.
 

 Applying this intermediate standard of review, I concur with Magistrate Candy’s conclusion that the charged conduct, including Lui’s acceptance of alleged bribes paid in anticipation of his becoming an influential official at BAT-HK, constitutes an offense under section 9. Indeed, on the basis of the same considerations that led me to conclude that such conduct would constitute an offense under section 39(a), I would reach the same conclusion even if I were applying a
 
 de novo
 
 standard of review to Magistrate Candy’s determination. Where a person accepts a bribe in anticipation of his or her obtaining influence that he or she agrees to exercise for the payor’s benefit if and when he or she obtains it, the agreement, by its nature, is a continuing one. If the recipient later acquires the influence and exercises it pursuant to the agreement, then, at least in that case, the agreement has in fact continued into the period of agency. It is this continuing agree
 
 *950
 
 ment by an agent that is made illegal by sections 2(2)(c) and 9(l)(a) of Hong Kong’s Prevention of Bribery Ordinance, as well as by section 39(a).
 
 [14]
 

 Before I leave the subject of dual criminality to discuss probable cause, I note that the government here is arguing two alternative theories of liability under section 9 with respect to the charged conduct that allegedly took place before Lui became BAT-HK’s Director of Exports. The government’s first theory is that Lui’s acceptance of an advantage then was illegal because, at the time of acceptance, he was an agent of B
 
 &
 
 W, a supplier to BAT-HK, and he knew that his agreement, if carried out, would necessarily have an incidental effect on his principal, i.e., B & W. This knowledge of incidental effect, according to the government, satisfies the requirement that the agreement be made by an agent in relation to the business or affairs of his principal.
 

 I do not believe that section 9 can plausibly be read to support the government’s incidental effects theory. Under the government’s theory, the law would be violated whenever an agent accepts a payment for conduct that is foreseeably detrimental to the principal’s interest. For example, section 9 would be violated under the government’s theory if an employee accepted a payment from his or her employer’s competitor to induce the employee to resign his or her position and come to work for the competitor. This cannot be; the statute is clearly intended to deal only with payments made for the purpose of influencing an agent’s conduct with respect to the discharge of duties entrusted to him or her by the principal. I thus reject the government’s argument that section 9 was violated because Lui, while an employee of B & W, accepted bribes to influence his conduct as a future employee of BAT-HK in ways that would foreseeably have an adverse effect on B & W.
 
 [15]
 

 The government’s second alternative theory of liability is that Lui became an agent of BAT-HK within the meaning of section 9 at least as early as June 1990, when he was “seconded” to BAT-HK, some eighteen months before he became BAT-HK’s Director of Exports. This alternative theory of liability is conceptually valid, but, for the reasons discussed in the next section, there is insufficient evidence to support it.
 

 B. Probable Cause
 

 As noted, 18 U.S.C. § 3184 directs the judicial officer to hear and consider “the evidence of criminality’’ to determine whether it is “sufficient to sustain the charge under the provisions of the proper treaty.” The Treaty, in turn, provides in Article IX that “[ejxtradition shall be granted only if the evidence be found sufficient according to the law of the requested Party ... to justify the committal for trial of the person sought if the offense of which he is accused had been committed in the territory of the requested Party.”
 
 See 28 U.S.T.
 
 at 232. When extradition is sought from the United States, the
 
 *951
 
 judicial officer is therefore required to determine whether the evidence at the extradition hearing would be sufficient under United States law to commit the accused for trial if his or her alleged offense had been committed here.
 

 This raises two preliminary questions. First, may the judicial officer consider evidence that would be inadmissible under the laws of evidence of the requesting party? This question is potentially material because Lui claims that courts in Hong Kong have already held that two smoking-gun-type witness statements proffered by the government are inadmissible under Hong Kong law.
 
 [16]
 
 The second question is whether the Treaty should be construed to require the judicial officer in the requested state to make a probable cause determination only with reference to the substantive law of the requested state. This question is potentially material because, with respect to Counts 3 through 6, the issue of probable cause is somewhat more complex with reference to Hong Kong’s section 9 than it is with reference to the federal wire fraud statute. Because I ultimately find that, even without consideration of the disputed witness statements, there is probable cause that Lui violated both United States and Hong Kong law as charged in Counts 1 and 3 through 10, neither issue has any impact on my decision. I nevertheless consider both issues as a precaution, in the event that a reviewing court disagrees with my conclusion that neither has any bearing on the outcome.
 

 I initially expressed my view regarding the evidentiary issue during the portions of the hearings on May 28 and May 29 when I addressed Lui’s motion in limine with respect to Chui’s statement. (Tr. of 5/28/96 at 68, 71; Tr. of 5/29/96 at 40-41.) My view has not changed. A judicial officer in the United States is not required to apply the requesting jurisdiction’s law of evidence in an extradition hearing. It follows that a ruling by a Hong Kong court that certain evidence would be inadmissible in Hong Kong is not binding at an extradition hearing in the United States. This conclusion is supported by the plain language of Article IX, by Article VII, by statute, and by case law.
 

 The plain language of Article IX directs that extradition is not to be granted unless “the evidence be found sufficient according to the law of the requested Party ... to justify the committal for trial” of the relator.
 
 See
 
 28 U.S.T. at 232. This is a clear direction to the judicial officer to apply the same evidentiary standards in making a probable cause determination in the extradition context that he or she applies when making a probable cause determination in a purely domestic context. Conversely, if the drafters had intended that the judicial officer consider only evidence that would be admissible under the law of the requesting party, they could easily have added a qualifying phrase after the word “evidence,” such as “that would be admissible under the requesting Party’s law.”
 

 Article VII buttresses this conclusion. After providing in VII(3) that the requesting party must proffer evidence of probable cause that would be sufficient to justify committal for trial under the requested party’s law, the Treaty provides in VTI(5) that any evidence given on oath or affirmed “shall be received in evidence in any proceedings for extradition” if it is duly authenticated.
 
 See id.
 
 at 231-32. There is no additional requirement that the evidence be admissible in the requesting jurisdiction. This is consistent with 18 U.S.C. § 3190, which also provides that documents offered in evidence at an extradition hearing “shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes” by the foreign tribunal. Although the language of the statute could be clearer, courts in various circuits have consistently held that section 3190 does not require that the evidence be admissible in the foreign tribunal — only that it meet any authentication requirement imposed by the foreign tribunal as a condition to admissibility.
 
 See
 
 
 *952
 

 Oen,
 
 858 F.2d at 1406;
 
 Emami v. United States Dist. Court,
 
 834 F.2d 1444, 1451 (9th Cir.1987);
 
 O’Brien v. Rozman,
 
 554 F.2d 780, 782-83 (6th Cir.1977);
 
 Esposito v. Adams,
 
 700 F.Supp. 1470, 1475 n. 6, 1476 (N.D.Ill. 1988);
 
 In re Extradition of Tang Yee-Chun,
 
 674 F.Supp. 1058, 1061-62 (S.D.N.Y.1987);
 
 United States v. Galanis,
 
 429 F.Supp. 1215, 1226-29 (D.Conn.) (Newman, J.) (discussing section 3190 and striking all testimony regarding admissibility in requesting country of exhibits in extradition hearing),
 
 habeas corpus granted by Galanis v. Pallanck,
 
 568 F.2d 234, 240 (2d Cir.1977).
 

 Lui does not dispute the authenticity of the evidence proffered by the government. For example, he does not deny that the statement purportedly signed by Chui is in fact a statement signed by Chui. Nor does he dispute that the method of authentication met the express technical requirements of the Treaty and 18 U.S.C. § 3190. In fact, he does not even appear to deny that, in the ordinary case, the judicial officer is not expected to undertake the daunting task of analyzing and applying foreign rules of evidence. What he does argue is that there is no reason to apply the ordinary rule here, because the Hong Kong courts have already determined that the contested evidence is inadmissible for all purposes in Hong Kong. Indeed, he goes even further and argues that it would be a “rude shock” and “a slap in the face of the Hong Kong judiciary” to consider in these proceedings evidence that has already been ruled inadmissible in Hong Kong. (Lui’s Post-Hr’g Mem. on Probable Cause at 8-9 n. 4.)
 
 [17]
 

 Lui’s argument is based on at least two false premises. The first is that it is the responsibility of the judicial officer in the probable cause phase of an extradition proceeding to assess the probability that the requesting state will be able to secure a conviction of the accused. It is not. The Supplementary Treaty states that “[p]robable cause means ... there is sufficient evidence to warrant a man of reasonable caution in the belief that ... an offense has been committed by the accused.”
 
 See
 
 Art. 2, T.I.A.S. No. 12050, at 7. The likelihood that the requesting state will be able to obtain a conviction, given its internal rules of evidence and procedure, is of no concern to the judicial officer in the requested state. Nor should it be, where the Treaty does not require it, where comity would frown upon it, and where the judicial officer cannot be expected to be sufficiently familiar with the adjudicatory process in the requesting state to make an informed prediction regarding the likelihood of a conviction.
 
 [18]
 

 The second false premise of Lui’s argument is that principles of issue preclusion apply here. They do not, if for no other reason than that the issue decided by the court in the requesting country (whether, under the requesting country’s rules of evidence, the evidence would be admissible in a judicial proceeding in the requesting country) is different from the issue to be decided by the extradition court (whether, under the requested country’s rules of evidence, the evidence would be admissible in a probable cause hearing in the requested country).
 

 
 *953
 
 There are other problems with Lui’s assertion that the extradition court must defer to a foreign court’s judgment with respect to the admissibility of evidence. It is not clear, for example, that the judgments by the Hong Kong courts on which Lui relies are final. Indeed, in one sense, Lui’s proposed rule would relieve the judicial officer from the burden of having to master foreign rules of evidence in exchange for his or her having to become expert with respect to the foreign law regarding the preclusive effect of judgments. Another problem is that, under Lui’s approach, the law that would apply in the United States extradition proceeding would vary from ease to case, depending on whether a foreign judicial officer was disposed to issue a declaratory judgment with respect to whatever evidentiary issue had been presented to him or her.
 
 [19]
 
 Finally, there is no exception in the Treaty or in 18 U.S.C. § 3190 for evidence that the requesting country has already declared to be inadmissible. For all these reasons, Lui is mistaken in his belief that a decision by a foreign judicial officer regarding the admissibility of evidence in foreign judicial proceedings is controlling in United States extradition proceedings.
 

 The second preliminary question is whether the judicial officer in the requested country must determine whether probable cause exists to believe that the accused violated the substantive law of the requesting country. The Treaty requires that each extradition request be accompanied by a statement of the facts constituting the offense for which extradition is sought and “the text, if any, of the law” defining that offense, prescribing the maximum penalty, and stating the statute of limitations.
 
 See
 
 Treaty, Art. VII(2)(b) & (c), 28 U.S.T. at 231. As noted, however, Article IX directs the judicial officer in the requested country to determine the sufficiency of the evidence “according to the law of the requested Party ... to justify the committal for trial ... if the offense ... had been committed in the territory of the requested Party.”
 
 See id.
 
 at 232. It would be sufficient to commit an accused for trial on the basis of an offense allegedly committed in United States territory if there were probable cause to believe that the accused has violated domestic law.
 
 See, e.g.,
 
 Fed. R.Crim.P. 5.1. Therefore, the Treaty does not require the extradition judge to consider the sufficiency of the evidence of wrongdoing with reference to foreign substantive law.
 

 Applying this standard, I find that,
 
 with or without consideration of the disputed evidence,
 
 there is probable cause that would justify Lui’s committal for trial under the federal wire fraud statute as to the charges made in Counts 1 and 3 through 8 and also under section 39(a) as to the charges made in Counts 1 and 3 through 10. Indeed, as noted, if it were necessary for me to make a finding of probable cause with reference to section 9, I would find that there is probable cause to commit Lui for trial on Counts 1 and 3 through 10 for all the reasons that I found probable cause with reference to section 39(a).
 

 The evidence whose admissibility Lui most strenuously contests consists of a statement that Chui gave in Singapore to Hong Kong investigators in July 1994, and the testimony in Hong Kong of Haddon-Cave as to what Chui told him about Lui’s acceptance of bribes. (Lui’s Post-Hr’g Mem. on Probable Cause at 1-15; Lui’s Post-Hr’g Reply Br. on Probable Cause at 1-13.) By way of background, Chui was one of the principals of GIL until September 1993. In his statement, Chui implicated himself, other principals of GIL, and Lui in a massive scheme to bribe Lui, and others, including Lui’s predecessors and assistants, to secure favorable allocations of cigarettes from BAT-HK. According to Chui, GIL began paying bribes to Lui when Lui and GIL’s principals first anticipated that Lui might eventually become an important BAT-HK decision-maker. Chui was murdered in Singapore nine months after he gave his statement and, for this reason, will be unavailable to testify. A justice of the Supreme Court of Hong Kong has entered a judgment on Lui’s application declaring that the Chui statement constitutes inadmissible hearsay and would not be admissible in any
 
 *954
 
 proceeding in Hong Kong as evidence of Lui’s criminality. (Filed as ex. at 5/29/96 hr’g.)
 

 Haddon-Cave testified in Hong Kong in October 1995 at a hearing to determine the sufficiency of the evidence to commit one of Lui’s alleged co-conspirators, Chong Tsoi-jun (“Chong”), for trial on a charge of conspiracy to offer advantages to Lui in violation of section 9. (United States’ exs. vol. 2, ex. KPZ-7 to Affirmation of Kevin Paul Zervos.) Chong was alleged to be a principal of GIL and one of the persons who controlled the disbursement of funds to Lui. Haddon-Cave testified, in substance, that he was hired by Chui to work as a consultant for GIL and in October 1992 began working there.
 
 (Id.
 
 at 93.) One of his job responsibilities was to foster relationships between GIL and its major suppliers, including BAT-HK.
 
 (Id.)
 
 Haddon-Cave testified that, soon after Chui hired him, Chui told him, in Lui’s presence, that Lui was “ ‘our man’ and an important link with Giant Island,” and that, a couple of months later, Chui told him, outside Lui’s presence, that Lui “was on the take” and had become wealthy as a result of the payments that distributors made to him to secure favorable allocations of cigarettes.
 
 (Id.
 
 at 96A.) This later statement would have been made by Chui while Haddon-Cave was working under Chui’s supervision at GIL and while Lui was BAT-HK’s Director of Exports.
 

 Chui’s July 1994 statement and HaddonCave’s testimony would clearly be admissible at a preliminary hearing under the Federal Rules of Criminal Procedure, if they were deemed reliable by the judicial officer.
 
 See
 
 Fed.R.Crim.P. 5.1(a) (“The finding of probable cause may be based upon hearsay evidence in whole or in part.”);
 
 see also
 
 Fed.R.Evid. 1101(d)(3) (Federal Rules of Evidence do not apply to extradition proceedings or to preliminary examinations in criminal cases). Indeed, although it is unnecessary for me to consider this question, it can plausibly be argued that both sets of statements would be admissible at trial as statements against interest by a declarant (Chui) who is unavailable as a witness.
 
 [20]
 

 See
 
 Fed.R.Evid. 804(b)(3). Whether or not these statements would be admissible at trial, however, I find both of them to be reliable, especially in light of the very substantial corroborating evidence discussed below. I find in particular that Haddon-Cave’s testimony that Chui told him that Lui was “on the take” is reliable, where Chui allegedly imparted this information to Haddon-Cave at a time when Chui was Haddon-Cave’s supervisor, the conspiracy was ongoing, and Haddon-Cave was responsible for maintaining the relationship between GIL and BAT-HK. Because this evidence would be admissible at a probable cause hearing in a domestic case, I now reaffirm my decision to admit it.
 

 The corroborating evidence here is substantial and covers all the advantages that Lui is charged with receiving or conspiring to receive in Counts 1 and 3 through 10. It includes the following:
 

 1. There was substantial evidence, consisting primarily of bank records and accounting records found at GIL, that the payments and loans, all of which were concealed by Lui, were made and that they were paid from accounts that GIL and its principals controlled and used to conduct GIL’s business. The same accounts were even used to distribute dividends to GIL’s principals.
 

 2. The payments reflected in Counts 3 through 8, in the aggregate, amount to approximately forty times Lui’s annual salary. The two unsecured loans reflected in Counts 9 and 10, in the aggregate, total about twenty times Lui’s annual salary and were made within three business days of Lui’s leaving his employment at B & W and BAT-HK.
 
 *955
 
 Payments in any amount by a distributor to the employee of a supplier who is primarily responsible for deciding how much product will be allocated to the distributor would be suspicious; payments in the enormous amounts involved here, by itself, would probably warrant a person of reasonable caution in the belief that the offense of bribery was being committed.
 

 3. The outright payments were not made by checks payable to Lui. They were elaborately structured in ways that were clearly intended to make them untraceable. Once made, the payments were immediately transferred by Lui or on his behalf to bank accounts outside Hong Kong, which accounts appear to have been opened for the specific purpose of receiving them.
 

 4. Lui offered no credible explanation for the payments. Indeed, there was no evidence at all to explain them, other than a proffer by Lui’s counsel to the effect that the payments represented a gratuitous gesture of gratitude by one of GIL’s former principals for Lui’s assistance in introducing him to a supplier of Japanese cigarettes in 1987, some six years before the last payments were made. This explanation is so implausible that, in and of itself, it gives credence to the government’s theory.
 

 5. With respect to the timing of the payments, there is credible evidence that Wai Pong, the predecessor of Lui’s immediate predecessor at BAT-HK, gave notice in December 1988 of his intention to emigrate to Canada in 1990, that he gave actual notice by letter dated January 8, 1990, of his intention to leave BAT-HK on May 14, 1990, (United States’ Rebuttal Mem., docket no. 59, at 14 and ex. BATHK-3 attached to Second Moffat Aff.), and that Lui’s name had been mentioned as a possible successor as early as December 1989. (United States’ exs. vol. 2, ex. KPZ-8 to Affirmation of Kevin Paul Zervos, David George Emmerson test, at 183.) This is consistent with the evidence that a payment of HK$2 million was made on February 17, 1990. There was also evidence that, although Lui was not chosen to be Wai Pong’s immediate successor, Lui’s name was mentioned again in April 1990 as a possible successor to the person who did immediately succeed Wai Pong, Leo Chan King-wei (“Chan”). (Ex. BATHK-63 attached to Second Moffat Aff., J.M. Aitken OF & SP Report of 4/30/90, at 2.) Evidence also showed that, when Chan was chosen, he had let it be known that he expected to leave Hong Kong by 1992.
 
 (Id.)
 
 These events would be consistent with the payments in April 1990 and May 1991 in the amounts of HK$2 million and HK$3 million, respectively. The next payment, HK$5 million, was made in August 1991, just after Chan had left BAT-HK. (Ex. BATHK-4 attached to Second Moffat Aff.) It is reasonable to assume that, at this point, it was suspected, if not known, that Lui would be named to follow Chan, as he soon was. The last two payments, totalling more than HK$9 million, were made while Lui served as Director of Exports. With the exception of the first alleged payment on October 21, 1988, I find probable cause that all of the payments made before Lui was named Director of Exports were made in anticipation that he would be.
 

 6. With respect to the timing of the unsecured loans to Lui by GIL’s affiliate in the amount of HK$10 million, these loans were made on May 5, 1993, three business days after Lui’s resignation from BAT-HK and B & W had become effective. A person of “reasonable caution” would be warranted in the belief that they were made to compensate Lui for the favors that he had bestowed on GIL during his tenure as Director of Exports and that they were made pursuant to an earlier agreement to do so.
 

 7. Although Chui did not correctly and precisely recall every relevant detail, Chui’s statement was consistent in many important respects with the documentary evidence that was subsequently discovered by Hong Kong investigators. For example, Chui estimated that the payments to Lui, in the aggregate, exceeded HK$25 million; in fact, total payments of HK$23.3 million were made to Lui, exclusive of the loans. Chui recalled that, when Lui first thought that he would be considered as Wai Pong’s successor, Lui solicited a bribe of HK$5 million, of which HK$2 million was to be paid in advance and HK$3 million was to be paid later. In fact, there were two payments to Lui in early 1990
 
 *956
 
 in the amount of HK$2 million each, and one payment on May 17, 1991, in the amount of HK$3 million. Finally, Chui was knowledgeable about the method of payment, and he was able to recall correctly the first three digits of Lui’s bank account at the Union Bank of Switzerland, into which many of the payments were deposited, at Chui’s instructions.
 

 The foregoing evidence, with or without consideration of the Chui statement and Haddon-Cave testimony, establishes probable cause to support the charges in Counts 1 and 3 through 10 under both United States and Hong Kong law.
 
 [21]
 
 With respect to Counts 3 through 6, which allege that payments were made in anticipation of Lui’s becoming Director of Exports for BAT-HK, I find, to the extent that it may be necessary for me to do so, probable cause that Lui violated section 9 because he accepted bribes pursuant to an agreement that remained in effect after he unquestionably became an agent (Director of Exports) of BAT-HK on or about January 1, 1992. I do not find probable cause, however, on the basis of the government’s alternative theory that Lui was acting as an agent of BAT-HK prior to January 1,1992. The only probative evidence regarding Lui’s responsibilities after he was seconded to BAT-HK in June 1990 and before he became Director of Exports was that he was serving as “the eyes and ears of B & W.” That is not a sufficient basis to warrant a person of reasonable caution in the belief that Lui was acting in any sense as an agent of BAT-HK prior to January 1,1992.
 

 Finally, Lui attempts to challenge Hong Kong’s right to assert jurisdiction over the alleged offenses. Lui’s -argument must be rejected for at least two reasons. First, it is unnecessary for the judicial officer in the requested country to decide whether the requesting country has jurisdiction over the offense for which extradition is sought.
 
 See Melia v. United States,
 
 667 F.2d 300, 303 (2d Cir.1981). Second, there appears to be jurisdiction under both United States law and Hong Kong law, in view of the fact that the purpose of the alleged conspiracy and payments, which were drawn from or deposited into banks in Hong Kong, was to influence in Hong Kong the performance of duties by an employee of a Hong Kong supplier in favor of a Hong Kong distributor.
 
 See id.
 
 at 303-04;
 
 Reg. v. Sansom
 
 (App. A to United States’ Post-Hr’g Resp.), at 118-20;
 
 Doot,
 
 at 817-18 (Lord Wilberforce), 822-23 (Viscount Dilhorne), 832-36 (Lord Salmon).
 

 C. Reversion and Specialty
 

 Lui’s final argument is that the specialty provision in the Treaty would be violated if, in the face of the impending reversion of Hong Kong to PRC sovereignty, he were extradited. To avoid any confusion, it is important to note at the outset two related arguments that Lui is not making.
 

 First, Lui is adamant that he is not arguing that there will be an automatic violation of the specialty provision of the Treaty (Article XII) if he is in Hong Kong awaiting trial, sentencing, or the completion of punishment on the date of reversion, on the theory that the change in sovereignty will constitute a
 
 de facto
 
 reextradition of him from Hong Kong to the PRC.
 
 [22]
 
 (Lui’s Post-Hr’g Reply Br. on
 
 *957
 
 the “Reversion” Issue at 6 (“Lui is
 
 not
 
 making an ‘automatic violation of specialty’ argument at all.”).) There is good reason for him not to do so. This same argument has been rejected by at least two courts,
 
 see Oen, 858
 
 F.2d at 1403-04 (holding that “even if Oen becomes subject to Chinese authority pursuant to a reversion of sovereignty upon cession and termination of the British lease of Hong Kong, he will not have been extradited to China”);
 
 Cheng Na-Yuet v. Hueston,
 
 734 F.Supp. 988, 992 (S.D.Fla.1990),
 
 affd,
 
 932 F.2d 977 (11th Cir.1991) (table), primarily on the authority of
 
 Terlinden v. Ames,
 
 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1902), which defined extradition as “the surrender by one nation to another of an individual accused or convicted of an offence outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender.”
 
 See id.
 
 at 289, 22 S.Ct. at 492.
 

 The second argument that Lui is not making is that there has been an anticipatory breach of the Treaty by the PRC, in that it has manifested by its words or deeds an intent not to abide by the specialty provision of the Treaty. Thus, Lui protests that the government could not be “further from the truth” when it asserts that his argument would require the court to “determine “whether the Hong Kong S.A.R. [Special Administrative Region] or the [PRC] can be trusted to respect the rule of specialty.’” (Lui’s Post-Hr’g Reply Br. on the “Reversion” Issue at 4.) To the contrary, Lui insists, his actual position is that such an inquiry is properly “left to the political branches,”
 
 (id.);
 
 that “[t]his is neither the time nor the forum ... for evaluating the trustworthiness of other countries,”
 
 (id.
 
 at 6); that “there is no way of knowing whether specialty rights will or will not be honored in post-reversion Hong-Kong,”
 
 (id.
 
 at 8); and that any attempt in this proceeding to predict the future course of events in Hong Kong “would require the court to speculate ... and to make inherently political judgments.”
 
 (Id.)
 
 In all these respects, I agree with Lui’s position and have no reason to doubt that the government does as well.
 

 What then is the substance of Lui’s reversion argument and on what legal theory is it based? The argument seems to be that, regardless of what actually happens or might happen to Lui in post-reversion Hong Kong, and without any consideration of the fact that the nation to whom the United Kingdom will be transferring sovereignty is the PRC, rather than some other nation whose legal traditions and institutions might be more compatible with our own, the Treaty, by its terms, precludes Lui’s extradition to a territory over which the United Kingdom will soon be relinquishing sovereignty.
 
 (Id.
 
 at 8-9.) The legal theory on which the argument is based is more difficult to grasp. Suffice it to say that Lui’s argument must be rejected as a matter of precedent and policy, and because it is unsupported by any credible legal theory.
 

 First, three reported eases are directly on point, and all three rejected essentially the same argument that Lui is making here.
 
 See Oen,
 
 858 F.2d at 1403-04;
 
 Hueston,
 
 734 F.Supp. at 992-94;
 
 Tang,
 
 674 F.Supp. at 1068.
 
 Oen
 
 and
 
 Hueston
 
 noted that the acceptance of a reversion argument like the one that Lui advocates would in effect constitute a judicial abrogation of the Treaty with respect to the extradition of any person who faced the prospect of incarceration beyond the date of reversion.
 
 See Oen,
 
 858 F.2d at 1404;
 
 Hueston,
 
 734 F.Supp. at 993. Lui attempts to distinguish these cases on the ground that the concern about reversion was more remote when they were decided six to eight years ago than it is today. This distinction is immaterial, however, since the relators in the prior cases maintained that they faced prison sentences that could have extended into the post-reversion period.
 
 See Oen, 858
 
 F.2d at 1403;
 
 Hueston,
 
 734 F.Supp. at 993. Indeed, even if Lui is ultimately extradited to Hong Kong, it is not certain that he will still be there on the date of reversion, since the charges against him could conceivably be dismissed following a
 
 *958
 
 committal proceeding upon Ms return to Hong Kong. (Tr. of 5/28/96 at 75-76.)
 

 Less directly on pomt because they did not involve the reversion of Hong Kong to PRC sovereignty, but no less significant, are two early cases arising out of the absorption by the newly formed German Empire of two previously independent German states that had been treaty partners of the Umted States. The cases are
 
 Terlinden,
 
 184 U.S. 270, 22 S.Ct. 484, and the case on which
 
 Terlinden
 
 relied,
 
 In re Thomas,
 
 23 F.Cas. 927 (C.C.S.D.N.Y.1874) (No. 13,887). In both cases, the relator contended that he could not be extradited to the German Empire because the Umted States had no extradition treaty with that sovereign and the Umted States’ treaties with the Kingdoms of Prussia and Bavaria, respectively, had been abrogated by the absorption of both kingdoms into the German Empire.
 
 See Terlinden,
 
 184 U.S. at 273, 282, 22 S.Ct. at 485, 489;
 
 Thomas,
 
 23 F.Cas. at 928, 930. In
 
 Thomas,
 
 the court noted that the constitution of the German Empire contained no provision annulling or abrogating treaties that existed at the time of the empire’s creation.
 
 See id.
 
 at 930. If the governments of the Umted States and the German Empire chose to regard the treaty between the Umted States and Bavaria as continuing in force, that was their prerogative, the court held, notwithstanding that our former treaty partner, Bavaria, no longer had the power to carry out its separate obligations under the treaty.
 
 See id.
 
 The Supreme Court cited
 
 Thomas
 
 with approval in
 
 Terlinden,
 
 when it faced a similar question regarding the absorption of Prussia into Germany. In a passage that has direct application to the present case, the Court stated:
 

 We concur in the view that the question whether power remains in a foreign State to carry out its treaty obligations is in its nature political and not judicial, and that the courts ought not to interfere with the conclusions of the political department in that regard.
 

 Terlinden,
 
 184 U.S. at 288, 22 S.Ct. at 491.
 

 One distinguishing factor in these cases is that the extradition requests in
 
 Terlinden
 
 and
 
 Thomas
 
 were made by the successor sovereign
 
 after
 
 sovereignty had been transferred from the original treaty partner,
 
 see id.
 
 at 270-73,276-77,282-84,22 S.Ct. at 484-85, 486-87, 489;
 
 Thomas,
 
 23 F.Cas. at 928, 930, while the request in the present case has been made by the origmal treaty partner
 
 before
 
 the transfer of sovereignty. But tMs distinction affects only the degree of confidence that the Umted States government might have in the willingness of the new sovereign to abide by the former sovereign’s treaty commitments. It has no bearing on the broader governing principle: when the sovereignty of a treaty partner changes, the decision to honor a request for extradition “is in its nature political and not judicial,” and hence should be decided by the “political department.”
 
 See Terlinden,
 
 184 U.S. at 288, 22 S.Ct. at 491.
 

 Lui’s argument must be rejected on the basis of policy considerations as well. The decision whether to honor or reject a treaty partner’s request for extradition can have important foreign policy implications. For tMs reason, the final decision to extradite (or not) has long been recognized to be the prerogative of the branch of government that is primarily responsible for the conduct of foreign affairs — the executive branch, acting through the Secretary of State.
 
 See
 
 18 U.S.C. § 3186. Political theorists can probably identify any number of good reasons for assigning primary responsibility for foreign affairs to the executive branch. These reasons would probably range from the need for consistency, uniformity, flexibility, and, not infrequently, confidentiality m order to conduct an effective foreign policy; the desirability in a democracy that policy decisions, foreign and domestic, be made and implemented by individuals with political accountability; and the value in havmg foreign policy made and implemented by career diplomats who devote their professional lives to keeping abreast of relevant worldwide developments. Whatever the reason, it is beyond dispute that the executive branch has primary responsibility for the conduct of foreign policy and that the decision to honor or reject a treaty partner’s extradition request has potentially significant foreign policy implications. Hence, such decision should be made
 
 *959
 
 by the Secretary of State, and “the courts ought not to interfere with the conclusions of the political department in that regard.”
 
 See Terlinden,
 
 184 U.S. at 288, 22 S.Ct. at 491.
 

 Lui makes essentially two arguments in response to the foregoing policy considerations. First, he argues that judicial deference to the executive branch is owed only when the Senate, through the ratification process, has expressed confidence in a treaty partner, but not when the treaty partner is about to be displaced by a sovereign to whom the Senate has not given its vote of confidence, as he asserts is the ease here. (Lui’s Post>-Hr’g Mem. on Reversion at 8.) Second, he contends that a judicial decision to certify Lui as extraditable would not give appropriate deference to, and would conflict with the will of, the political branches that extraditions to Hong Kong cease under the present circumstances.
 
 (Id.
 
 at 3-7; Lui’s Post-Hr’g Reply Br. on the “Reversion” Issue at 10.) His two arguments are not only inconsistent with each other, but also patently incorrect.
 

 The first problem with Lui’s argument that judicial deference is owed to the Secretary of State only when the Senate has, through the ratification process, expressed a degree of confidence in a treaty partner is that it overlooks the obvious fact that the Senate did indeed ratify the Treaty, and the request for Lui’s extradition has been made by the very partner in whom Lui would say the Senate expressed confidence when it did so — the United Kingdom. Lui apparently wishes to question the wisdom or perhaps even the good faith of this request, on the ground that the United Kingdom cannot assure Lui that his personal rights and safety will be protected. These are precisely the types of questions that should be addressed to the person in whom the Treaty, as ratified by the Senate, and the relevant statutes, as enacted by Congress, vest ultimate decision-making authority with respect to such matters — the Secretary of State.
 
 [23]
 

 Further, it is plainly wrong to say that deference is owed to the Secretary of State only when the request to extradite is made by a treaty partner in whom the Senate has expressed its confidence through the ratification process. In
 
 Terlinden
 
 and
 
 Thomas,
 
 deference was given to the decision by the Secretary of State to accept extradition requests from the German Empire despite that fact that the Senate had never ratified a treaty with that sovereign.
 
 See Terlinden,
 
 184 U.S. at 287-90, 22 S.Ct. at 491-92;
 
 Thomas,
 
 23 F.Cas. at 930. In fact, the German Empire did not exist when the Senate ratified treaties with Prussia and Bavaria, and, therefore, the Senate could not possibly have expressed confidence in its reliability and trustworthiness as a treaty partner. Similarly, in
 
 In re Requested Extradition of Tuttle (United States v. Tuttle),
 
 966 F.2d 1316, 1317 (9th Cir.1992), the Secretary of State was willing to extend to the Commonwealth of the Bahamas, which had gained independence from the United Kingdom in 1973, rights under a 1931 treaty between the United States and the United Kingdom. The relator objected on basically the same ground that Lui is objecting here: although the Senate had ratified a treaty with the United Kingdom that was, at the time of ratification, applicable to the colonial Bahamas, it never ratified a separate treaty with the independent Bahamas.
 
 See id.
 
 The court rejected this argument, stating: “Since the Bahamas could and did adopt the 1931 treaty, Tuttle’s argument regarding the separation of powers ... fails because the 1931 treaty was ratified by the Senate.”
 
 See id.
 
 Thus, deference was owed to the judgment of the Secretary of State to extend treaty privileges to the Bahamas, despite the fact that the Senate never passed upon the reliability of the Bahamas as a treaty partner.
 
 See id.; accord Sabatier v. Dabrowski,
 
 586 F.2d 866, 868 (1st Cir.1978).
 

 The argument in favor of deference is far more compelling in the present case than it was in the cited cases; the extradition request here was made by the very sovereign in whom the Senate expressed confidence when it voted to ratify the Treaty and to whom the United States made a commitment
 
 *960
 
 to honor requests for extradition while the Treaty remained in existence. Any decision to dishonor that commitment on the basis of recent or future changes in circumstances is a political one that should be made by the Secretary of State.
 

 Lui’s second policy argument is that it would thwart the will of the political branches to certify him as extraditable. In fact, just the opposite is true.
 

 With respect to the executive branch, the Secretary of State has complete discretion to extradite or not. In fact, the Secretary can exercise that discretion in any of three ways: by giving six months’ notice of termination of the entire Treaty “through the diplomatic channel,” pursuant to Article XVT(4),
 
 see
 
 Treaty, 28 U.S.T. at 234; by giving six months’ notice of termination of the Treaty only as it applies to Hong Kong, pursuant to Article 11(2),
 
 see id.
 
 at 229; or simply by refusing to extradite a particular individual,
 
 see
 
 18 U.S.C. § 3186, while leaving the Treaty entirely intact. The Secretary thus not only has considerable discretion, but he also has the necessary flexibility to address and take into consideration developments in this complex and rapidly changing situation as they occur. Indeed, the Secretary has even more flexibility than this, in that he may decline to extradite except upon conditions tailored by him to meet the needs of whatever situation may develop as the date of reversion approaches.
 
 See Demjanjuk v. Petrovsky, 776
 
 F.2d 571, 584 (6th Cir.1985) (“A decision to attach conditions to an order of extradition is within the discretion of the Secretary of State, not the courts.”),
 
 cert. denied,
 
 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986);
 
 Emami v. United States Dist. Court,
 
 834 F.2d 1444, 1454 (9th Cir.1987) (“[T]he State Department alone has the power to condition the extradition of [the relator] on an agreement with Germany not to deport [the relator] to Iran.”);
 
 Sindona v. Grant,
 
 619 F.2d 167, 176 (2d Cir.1980) (“The Secretary would thus be empowered if so advised, to condition surrender on [relator’s] continuing access to American counsel.”). Thus far, at least, the Secretary has chosen not to exercise his authority to terminate the Treaty, in whole or in part. This is sufficient proof of the executive branch’s desire to maintain a treaty relationship with Hong Kong despite the pendency of reversion, at least for now. A refusal to certify Lui as extraditable would, for all practical purposes, be tantamount to an immediate abrogation of the Treaty by judicial decree, in direct contravention of the Secretary’s authority, not exercised to date, not to terminate.
 
 [24]
 
 More than that, it would utterly deprive the Secretary of the opportunity that he otherwise would have to exercise his discretion as he saw fit to extradite or not, or to extradite on conditions. It is thus frivolous to argue that I would be thwarting the will of the executive branch if I were to deem the Treaty fully effective and certify Lui as extraditable.
 

 A similar analysis applies to the legislative branch. Congress, by enacting 22 U.S.C. § 5721(b) (1994), has clearly stated its desire to maintain in force current treaties applicable to Hong Kong at least through the date of reversion. That section provides in pertinent part as follows:
 

 For all purposes, including actions in any court in the United States, the Congress approves the continuation in force on and after July 1, 1997, of all treaties ... entered into before such date between the United States and Hong Kong, or entered into before such date between the United States and the United Kingdom and applied to Hong Kong, unless or until terminated in accordance with law. If in carrying out this subchapter, the President determines that Hong Kong is not legally competent to carry out its obligations under any such treaty ... or that the continuation of Hong Kong’s obligations or rights under any such treaty ... is not appropriate under the circumstances, such determination shall be reported to the Congress____
 

 22 U.S.C. § 5721(b);
 
 see also id.
 
 § 5701(2) (“The Congress declares its wish to see full implementation of the provisions of the Joint Declaration.”);
 
 id.
 
 § 5701(3) (“The President has announced his support for the policies
 
 *961
 
 and decisions reflected in the Joint Declaration.”);
 
 id.
 
 § 5701(4) (“the United States [has] a strong interest in the continued vitality, prosperity, and stability of Hong Kong.”). As far as I am aware, the President has not reported to the Congress that Hong Kong “is not legally competent to carry out its obligations under [the Treaty]” or that the “continuation of Hong Kong’s ... rights under [the Treaty] is not appropriate under the circumstances.”
 
 See id.
 
 § 5721(b).
 

 One may debate the legal effect of section 5721(b), but the conviction that it expresses is clear. The first sentence is a powerful statement by the Congress that the Treaty shall remain in effect “until terminated in accordance with law.”
 
 See id.
 
 The language in the second sentence regarding Hong Kong’s competence to carry out its treaty obligations is strongly reminiscent of the Supreme Court’s language in
 
 Terlinden,
 
 184 U.S. at 288, 22 S.Ct. at 491 (“We concur in the view that the question whether power remains in a foreign State to carry out its treaty obligations is in its nature political and not judicial, and that the courts ought not to interfere with the conclusions of the political department in that regard.”). Section 5721(b) is thus an unmistakable endorsement by the Congress of the Supreme Court’s judgment about the respective roles of the executive and judicial branches in this sensitive area.
 

 Further, the Senate ratified the Supplementary Treaty in 1986,
 
 see
 
 T.I.A.S. No. 12050, at 1, with knowledge of the fact that sovereignty over Hong Kong would revert to the PRC in 1997. It may be inferred from the fact that the Supplementary Treaty does not specifically address reversion or the possibility that persons extradited to Hong Kong might still be serving sentences on the date it occurred that the Senate was satisfied that the means available to the Secretary of State for dealing with the reversion situation were entirely satisfactory. In the face of all this evidence, it is frivolous to argue that I would be thwarting the will of the Congress if I were to deem the Treaty fully effective and certify Lui as extraditable.
 

 This leaves for consideration the legal theory on which Lui purports to base his argument that a judicial officer may not certify a relator as extraditable to a territory whose sovereignty may change while the relator is there. To the extent that there may be such theory, it is severely flawed.
 

 There are two implicit premises at the core of Lui’s argument: (1) when an extradition treaty provides specialty protection, the treaty includes an implied term that no relator will be certified as extraditable unless the requesting country provides assurances to the judicial officer in the requested country that it has the intent and the means to provide specialty protection for as long as the relator is entitled to receive it; and (2) as a matter of law, the relator is entitled to receive specialty protection even after the treaty under which he was extradited terminates. The first premise is incorrect; the second premise may be correct, but, if it is, it simply underscores the appropriateness of assigning to the Secretary of State, rather to than the judicial officer, the final extradition decision.
 

 Regarding the first premise, Lui has cited no authority for the proposition that the Treaty contains an implied term requiring the requesting state to give assurances of future compliance to the judicial officer. Furthermore, the rule of non-inquiry would clearly preclude the judicial officer from being the one to demand and receive such assurances, if any were required.
 
 See Demjanjuk,
 
 776 F.2d at 583;
 
 see also In re Extradition of Manzi (United States v. Manzi),
 
 888 F.2d 204, 206 (1st Cir.1989) (per curiam),
 
 cert. denied,
 
 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990);
 
 Koskotas v. Roche,
 
 931 F.2d 169, 173-74 (1st Cir.1991). Rather, such assurances would properly be sought and received by the Secretary of State,
 
 following
 
 the certification of the relator as extraditable. It is no response to say, as Lui does, that there is an exception to the rule of non-inquiry where it is already clear that the treaty partner cannot possibly provide satisfactory assurances. If that is the case, the Secretary of State is as fully capable of making the proper decision as he is when the issue of future compliance is less clear-cut. Whether or not it is possible for the treaty partner to provide satisfactory assurances of future compliance, a judicial
 
 *962
 
 officer has no right to demand that it do so in the context of the extraditability determination.
 

 Regarding the second premise, Lui’s position on the question whether specialty rights exist independent of the treaty that created them is unclear. On the one hand, Lui dismissed the notion that specialty rights exist in “the ether.” (Tr. of 5/22/96 at 51-52.) Along the same lines, he has specifically stated that the PRC’s
 
 legal
 
 obligation to comply with the Treaty’s specialty provision will terminate when the Treaty does. (Lui’s Post-Hr’g Reply Br. on the “Reversion” Issue at 17 n. 6 (“[0]nce reversion occurs, there would be no legal bar whatsoever to the PRC’s working its will with Jerry Lui either in Hong Kong or in Shanghai.”).) If that is true, however, then it would appear there are no post-termination specialty rights for a court or anyone else to protect or enforce. On the other hand, if, as Lui’s argument implies, the right to specialty protection continues as a matter of international law even after the treaty that created those rights has terminated, then the sovereign holding the relator in custody at the time of termination has a legal duty to continue to honor the expired treaty’s specialty provision. Then the question becomes whether we can trust such sovereign — in this case the PRC — to do so.
 

 Scholars of international law may long debate whether, under the circumstances present here, specialty rights survive the termination of the treaty that created them. There is no need for me to express an opinion on that subject, however, because all parties to these proceedings agree that the question of whether we can trust the PRC is a political one that should be answered by the Secretary of State. Thus, as Lui himself states:
 

 Lui’s argument is that there is no way of knowing whether specialty rights will or will not be honored in post-reversion Hong Kong. The Court is not well-equipped to determine whether or not the political conditions in post-reversion Hong Kong will be conducive to specialty’s being honored. In any event, well-equipped or not, such an exercise would require the court to speculate on the future course of Hong Kong’s life and institutions and to make inherently political judgments.
 

 (Id.
 
 at 8 (footnote omitted).)
 

 Because the first premise of the legal theory underlying Lui’s argument is incorrect and the second premise, if correct, simply underscores the need for the Secretary of State to make a political judgment that, as Lui points out, I am not well-equipped to make, Lui’s legal theory does not withstand analysis.
 

 For all the foregoing reasons, I reject Lui’s argument that the impending reversion renders him unextraditable. This is not at all to say that the concerns Lui has raised are not of extreme importance. They are, and they should be addressed at the highest levels of government. But I return to where I began: in the final analysis, the question is not
 
 what
 
 factors should be considered in deciding whether Lui should be extradited, but
 
 who
 
 should consider them. It is my firm opinion that the person who should consider them is the Secretary of State.
 

 VI. Conclusion and Certification
 

 For all the foregoing reasons, I hereby certify that the evidence is sufficient to sustain Charges 1 and 3 through 10 of the warrant for Lui’s arrest dated February 5, 1996 under the Treaty and the Supplementary Treaty and that Lui is thus extraditable to the Crown Colony of Hong Kong pursuant to those charges. I further certify this matter together with all documentary evidence and the transcripts of testimony taken before me in this matter to the Secretary of State that a warrant may issue upon the requisition of the proper authorities for Lui’s surrender. This certification of extraditability shall be stayed for a period of ten days to give Lui an opportunity to pursue whatever form of review may be available. During this stay, Lui shall remain in the custody of the United States Marshal.
 

 [1]
 

 . The Treaty was made applicable to Hong Kong, among other territories, by an exchange of diplomatic notes on October 21, 1976.
 
 See
 
 28 U.S.T. at 23 8-41. The Supplementary Treaty is applicable to Hong Kong by its terms.
 
 See
 
 Article 6 and Annex, T.I.A.S. No. 12050, at 8, 10.
 

 [2]
 

 . There is no dispute that this warrant, issued by Magistrate Ian Candy, is authentic, and that Magistrate Candy was authorized by Hong Kong law to issue arrest warrants.
 

 [3]
 

 . The arrest warrant in this case mistakenly refers to "Brown and Williamson Limited,” a nonexistent coxporation, instead of Brown & Williamson Tobacco Corporation. I am persuaded, on the basis of the Information of Anthony Alan Godfrey, that the company referred to as "Brown and Williamson Limited” was intended to be B & W, and that, under Hong Kong law, this misnomer is not fatal to the warrant or the prosecution.
 

 [4]
 

 . 18 U.S.C. § 3184 provides in pertinent part:
 

 Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered.... If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.
 

 18 U.S.C. § 3186 provides in pertinent part:
 

 The Secretary of State may order the person committed under sections 3184 or 3185 of this title to be delivered to any authorized agent of such foreign government, to be tried for the offense of which charged.
 

 [5]
 

 . Although the judiciary has been sharing responsibility with the executive branch in this manner for well over a century, one district court recently held that at least some aspects of this approach to extradition violate the principle of separation of powers in the United States Constitution.
 
 See Lobue v. Christopher,
 
 893 F.Supp. 65, 75 (D.D.C.1995),
 
 vacated on other grounds,
 
 82 F.3d 1081, 1082 (D.C.Cir.1996). Other courts that have considered the question since
 
 Lobue
 
 have held to the contrary, some explicitly disagreeing with the district court’s decision in
 
 Lobue. See Sandhu v. Bransom,
 
 932 F.Supp. 822, 826 (N.D.Tex.1996);
 
 In re Extradition of Marzook,
 
 924 F.Supp. 565, 570-71 (S.D.N.Y.1996);
 
 In re Extradition of Lin,
 
 915 F.Supp. 206, 211-15 (D.Guam 1995);
 
 In re Extradition of Sutton,
 
 905 F.Supp. 631, 636-37 (E.D.Mo.1995). I find the reasoning of these other courts persuasive and similarly reject the argument that 18 U.S.C. § 3184 is unconstitutional.
 

 [6]
 

 . Article XVI(4) permits either party to terminate the Trealy in its entirety by giving six months' notice "through the diplomatic channel.”
 
 See
 
 28 U.S.T. at 234.
 

 [7]
 

 . It is very likely that the discretion to decide whether the assurances are “satisfactory to the requested Party” vests in the Secretary of State for at least two reasons. First, since the Secretary of State has discretion, over the ultimate decision whether or not to éxtradite a relator once the relator has been found extraditable,
 
 see
 
 18 U.S.C. § 3186, the Secretary is in a far better position to request and evaluate any assurances pursuant to Article IV of the Treaty. Second, the officer who presides at the extradition proceeding does not exercise the judicial power of the United States and need, not be an Article III judge or even a federal officer.
 
 See In re Kaine,
 
 55 U.S. (14 How.) *103, *120, 14 L.Ed. 345 (1852),
 
 cited in Howard,
 
 996 F.2d at 1325.
 

 [8]
 

 . The
 
 Oen
 
 court’s reading of Article III not only is plausible and consistent with its plain language but also, as noted, is supported by the distinction drawn in Article XVI(2) between situations in which the scheduled offense was committed before the Treaty became effective and cases in which the offense was committed after the Treaty became effective. Only in those cases where the scheduled offense was committed before the Treaty became effective — which is not the case here — was it necessary to find that the offense violated the laws of both countries.
 

 [9]
 

 . As noted, however, in
 
 Brauch,
 
 even though the offenses were of the schedtded variety, the court extended the dual criminality inquiry to determine whether the charged conduct constituted an offense under English law.
 
 See
 
 618 F.2d at 850-54. Indeed, although it was unnecessary for it to reach the issue because it found that some of the conduct in question did not constitute a crime under United States (New Hampshire) law, the court concluded that the accused's alleged conduct also did not constitute a crime in England, notwithstanding that a multiple-count indictment had been returned against him there.
 
 See id.
 
 at 847, 853-54. It does not appear from the opinion that either party questioned whether the Treaty required or permitted a magistrate judge in the United States to reject an English indictment on the ground that it sought to criminalize conduct that the magistrate judge concluded did not violate English law.
 

 [10]
 

 . This section was enacted as part of the Anti-Drug Abuse Act of 1988, Pub.L. No. 100-690, § 7603(a), 102 Stat. 4181, 4508 (1988).
 

 [11]
 

 . Lui argues that dual criminality is not satisfied because United States law imposes a stricter standard of intent than Hong Kong law. (Lui's Extradition Mem. Concerning Probable Cause and Subsidiary Legal Issues, docket no. 54, at 10 n. 11.) Assuming, without deciding, that Lui is correct on this point, it is irrelevant, because, as discussed in the above text, the intent charged here — that Lui knowingly accepted bribes for the purpose of influencing his conduct in favor of GIL and others — would be sufficient to satisfy even the stricter standard of intent purportedly required under United States law.
 
 See, e.g., Collins v. Loisel,
 
 259 U.S. 309, 312, 42 S.Ct. 469, 470-71, 66 L.Ed. 956 (1922);
 
 Branch,
 
 618 F.2d at 847, 850-54 (court’s inquiry "is not whether all conduct punishable under [the foreign law] would be criminal under [United States law], but whether the particular conduct in this case is made criminal under both countries’ laws”).
 

 [12]
 

 . The court already ruled at the extradition hearing that there is no probable cause as to Count 2 in any event, because there is no evidence from which it could be inferred that Lui or the payor of the October 1988 payment anticipated as early as that time that Lui would eventually occupy a position of influence at BAT-HK. (Tr. of 5/29/96 at 84-85.)
 

 [13]
 

 . As noted, Hong Kong’s Prevention of Bribery Ordinance provides, in section 2(2)(c), that “a person accepts an advantage if he ... directly or indirectly ...
 
 agrees
 
 to take, receive or obtain any advantage.” (Emphasis added.)
 

 [14]
 

 . My conclusion that Lui violated section 9 if he exercised influence at BAT-HK pursuant to an agreement he initially entered into before he became its agent is buttressed by at least two of the opinions in a 1973 House of Lords case,
 
 Director of Public Prosecutions v. Doot,
 
 attached as App. B to United States' Resp. to Def.'s Post-Hr’g Mem. on Probable Cause and Reversion. The opinions of Viscount Dilhome,
 
 see id.
 
 at 822-23, and of Lord Salmon,
 
 see id.
 
 at 835, make clear that, under English law, an illegal agreement continues at least through the time it is carried out. There is ño reason that the rule should differ where a prospective agent makes an agreement with the understanding that his or her obligation to perform will be deferred until after performance will have become illegal.
 

 [15]
 

 . In an attempt to limit the almost boundless scope of its incidental effects theory, the govemment suggests that the ordinance would apply only where the incidental effects were felt by the agent’s present principal. (United States' Post-Hr’g Mem. at 24 n. 9.) As illustrated by the hypothetical payment to an employee to induce him or her to resign and begin working for a competitor, however, this limiting principle does not adequately confine the reach of the government's theory. The government also attempts to buttress its theory by citing the 1993 decision by the Supreme Court of Hong Kong in
 
 The Queen and Chong Chui Ha and Shing Man On.
 
 (Attached as App. E to United States’ Post-Hr'g Mem.) That case is distinguishable, however, in that the payment there was solicited by the agent for the specific purpose of influencing the agent in the discharge of her duties
 
 qua
 
 agent.
 
 See id.
 
 at 3, 7-13.
 

 [16]
 

 . The first statement was by Chui To-Yan, a/k/a Tommy Chui ("Chui"), an admitted co-conspirator with Lui. The second statement was by Francis McNamara Haddon-Cave ("HaddonCave”), who worked with Chui. Both statements are discussed in detail below.
 

 [17]
 

 . Lui also argues that 18 U.S.C. § 3190, as courts have consistently construed it, is unconstitutional under the doctrine of separation of powers. This argument is not persuasive. Congress routinely makes rules of evidence applicable to proceedings in federal courts, subject, of course, to constitutional imperatives such as the Confrontation Clause. There is no reason it should not be permitted to do so here. In addition, his constitutional argument fails because it is rooted in an incorrect reading of section 3190.
 

 [18]
 

 . To illustrate the problem, consider a hypothetical rule of evidence or procedure in the requesting state that required that a conviction for a particular crime be supported by at least one eyewitness. Would it be appropriate for an extradition judge to deny extradition, notwithstanding overwhelming circumstantial evidence against the accused presented at the extradition hearing, on the ground that, without an eyewitness, the requesting state could not realistically expect to secure a conviction? It would be impossible to reconcile such result with the definition of probable cause in the Supplementary Treaty ("sufficient evidence to warrant a man of reasonable caution in the belief that an offense has been committed by the accused”), and it would be unnecessary and inappropriate for the judicial officer in the requested state to become so concerned with the requesting state’s internal rules of evidence and procedure.
 

 [19]
 

 . The approach that Lui advocates would presumably apply to the entire body of evidentiary rules applicable in the requesting state and not only to hearsay objections.
 

 [20]
 

 . The High Court of Hong Kong apparently did not consider this particular exception to the hearsay rule in ruling upon the admissibility of Haddon-Cave’s testimony against Chong, perhaps because it does not exist under Hong Kong law. (Ex. AAH-4 to Second Aff. of Adrian Armstrong Huggins, docket no. 77, at 1-2.) All the High Court considered with respect to Chui's alleged statement to Haddon-Cave was whether it was a statement by a co-conspirator in furtherance of the conspiracy.
 
 (Id.)
 
 As to that, the court stated, without elaboration, that Chui’s alleged statement “could not as a matter of law be in furtherance of the alleged conspiracy to offer advantages.”
 
 (Id.
 
 at 2.)
 

 [21]
 

 . Lui argues that the evidence, at most, establishes that the payments were made, but he denies that there is any probative evidence that he knew why they were made. (Lui's Post-Hr'g Reply Br. on PC at 13-14.) There is, however, ample evidence, direct and circumstantial, about the payors' motive in making the payments. It may be inferred as a matter of common sense that payors of bribes amounting to millions of United States dollars will communicate to the recipient why they are making the payments and what favors they expect in return.
 

 [22]
 

 . Lui also advances an argument pertaining to Article IV of the Treaty that is similar to his specialty argument and merits similar responses. In contrast to Article XII, however, this provision actually contains a mechanism by which one Treaty partner can seek assurances from the other. Article IV provides
 

 [i]f the offense for which extradition is requested is punishable by death under the relevant law of the requesting Party, but the relevant law of the requested Party does not provide for the death penalty in a similar case, extradition may be refused unless the requesting Party gives assurance satisfactory to the requested Party that the death penalty will not be carried out.
 

 28 U.S.T. at 230. Although Lui acknowledges that Article IV is applicable only when a relator
 
 *957
 
 might be subject to the death penalty, he speculates that he might face such penalty under Chinese law given the absence of assurances that specialty protection will be honored. (Lui's Post-Hr’g Mem. on Reversion at 15-18.)
 

 [23]
 

 . Significantly, 18 U.S.C. § 3184 gives no discretion to the judicial officer to refuse to certify extraditability on the ground that a treaty partner cannot assure the accused that his or her rights under a treaty will be enforced or protected.
 

 [24]
 

 . It would also violate the Treaty's requirement that six months' notice of termination be given.